FILED
CLERK, U.S. DISTRICT COURT

JUL 25 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

JUL 2 6 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| MARIO A. BURTON,<br><br>                    Plaintiff,<br><br>          v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>                    Defendant. | No. ED CV 04-384-PLA<br><br>**MEMORANDUM OPINION AND ORDER**<br><br>THIS CONSTITUTES NOTICE OF ENTRY<br>AS REQUIRED BY FRCP, RULE 77(d). |

I.

## PROCEEDINGS

Plaintiff filed this action on April 5, 2004, seeking review of the Commissioner's denial of his application for Supplemental Security Income benefits. The parties filed a Consent to proceed before the undersigned Magistrate Judge on June 2, 2004. Pursuant to the Court's Order, the parties filed a Joint Stipulation on April 4, 2005, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

II.

## BACKGROUND

Plaintiff was born on March 31, 1961.  [Administrative Record ("AR") at 85.]  He has a twelfth grade education and past relevant work experience as a warehouse worker and asbestos removal worker. [AR at 106, 113, 153, 277-78.]

On March 15, 2001, plaintiff filed an application for Supplemental Security Income benefits. [AR at 85-88.]  Plaintiff alleged disability due to HIV, back pain, depression, fatigue, and diarrhea. [AR at 100.]  Plaintiff claimed that he has been unable to work since September 12, 1994. [AR at 85, 100.] Plaintiff's onset date has since been amended to February 28, 2001. [AR at 273.] After his application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held on August 28, 2003, at which plaintiff appeared with an attorney and testified on his own behalf.  Testimony was also presented by a vocational expert, a medical expert, and a lay witness.  [AR at 268-303.]  On January 12, 2004, the ALJ determined that plaintiff was not disabled and thus not entitled to benefits. [AR at 11-17.]

When the Appeals Council denied review on March 4, 2004, the ALJ's decision became the final decision of the Commissioner.  [AR at 5-7.]

III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's

1   decision, the Court examines the administrative record as a whole, considering adverse as well

2   as supporting evidence.  Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th

3   Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court

4   must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala,

5   53 F.3d 1035, 1040-1041 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

6

7                                                    IV.

8                              THE EVALUATION OF DISABILITY

9            Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

10   to engage in any substantial gainful activity owing to a physical or mental impairment that is

11   expected to result in death or which has lasted or is expected to last for a continuous period of

12   at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

13

14   A.       THE FIVE-STEP EVALUATION PROCESS

15            The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

16   whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

17   828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must

18   determine whether the claimant is currently engaged in substantial gainful activity; if so, the

19   claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

20   substantial gainful activity, the second step requires the Commissioner to determine whether the

21   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

22   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

23   If the claimant has a "severe" impairment or combination of impairments, the third step requires

24   the Commissioner to determine whether the impairment or combination of impairments meets or

25   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404,

26   Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.

27   If the claimant's impairment or combination of impairments does not meet or equal an impairment

28   in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

1  sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

2  and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform

3  past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie

4  case of disability is established. The Commissioner then bears the burden of establishing that

5  the claimant is not disabled, because he can perform other substantial gainful work available in

6  the national economy. The determination of this issue comprises the fifth and final step in the

7  sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966

8  F.2d at 1257.

9

10 **B.      THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

11        In this case, at step one, the ALJ concluded that plaintiff has not engaged in any

12 substantial work activity since the alleged onset of his disability. [AR at 15.] At step two, the ALJ

13 concluded that plaintiff has "severe HIV, back pain, and a depressive disorder." [Id.] At step three,

14 the ALJ found that plaintiff's impairments do not meet or equal the requirements of any of the

15 impairments in the Listing. [Id.] The ALJ further found that plaintiff has the residual functional

16 capacity[1] to perform "the full range of light work[2] with occasional climbing, balancing, stooping,

17 kneeling, crawling or crouching and to work involving simple, repetitive tasks in a non-public work

18 setting with minimal contact with peers and supervisors." [AR at 16.] At step four, the ALJ

19 concluded that plaintiff is unable to perform his past relevant work. [Id.] At step five, the ALJ

20 concluded that based on plaintiff's residual functional capacity, age, education, and work

21 experience, there is a significant number of jobs he can perform in the regional or national

22 economy. [Id.] Thus, the ALJ found plaintiff not disabled. [Id.]

23

24  ─────────────────

25  [1]   Residual functional capacity ("RFC") is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

26
27  [2]   Light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg
28  controls." 20 C.F.R. §§ 404.1567(b) and 416.967(b).

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ (1) failed to appropriately consider the testimony of plaintiff's ex-girlfriend, Candy Ewell; and (2) failed to pose a complete hypothetical question to the vocational expert. For the reasons discussed below, the Court respectfully disagrees with plaintiff, and affirms the Commissioner's decision.

### A.     THE EVIDENCE

At the hearing on August 28, 2003, plaintiff testified that he was born on March 31, 1961, and had completed high school. [AR at 276.] Plaintiff further testified that he was experiencing problems with depression and was hearing voices. [AR at 281.] Plaintiff stated that he had problems with mood swings, such that he did not like to be around people and tended to get very angry at times. [AR at 281.] When asked if he had trouble with confusion and organizing his days, plaintiff responded that he usually forgets his appointments and that his son's mother generally has to remind him about things like that. [AR at 282.] Plaintiff testified that he cannot concentrate at all and that he sleeps most of the day as a result of the medication he is taking.[3] [Id.] He also has severe back pain, as a result of which he cannot bend or stoop, and has trouble sitting and standing. [AR at 282.]

---

[3]    According to plaintiff's undated Disability Report [AR at 99-108], plaintiff's ability to work is limited by HIV, depression, back pain, fatigue, and diarrhea. [AR at 100.] To combat his HIV, plaintiff takes several medications, including Combivir and Viracept which, according to plaintiff, create the side effects of anemia, headaches, nausea, vomiting, abdominal pains, tingling pain in his hands and feet, and diarrhea. [AR at 105.]

According to the HIV Functional Capacity Questionnaire filled out by plaintiff on March 25, 2001, plaintiff grooms himself without assistance or rest, and does his own laundry, but needs assistance with other household chores. [AR at 121-23.] When plaintiff leaves the house, someone drives him. [Id.] Plaintiff indicated that he could walk or stand for less than 1 hour before resting, sit for 3 hours before resting, and required 2 naps per day, generally totaling 5 hours. [Id.] Plaintiff also wrote that in addition to HIV, he suffered from severe lower back pain, such that any bending, lifting, walking, or standing for any length of time would cause him "to be doubled over and unable to walk." [Id.]

1    Plaintiff's ex-girlfriend, Candy Ewell, also testified at plaintiff's hearing, affirming much of

2  what plaintiff stated above. Ewell reiterated that plaintiff appeared to suffer from depression on

3  a daily basis, was irritable and "snappy" with everybody, and had trouble concentrating and

4  remembering to go to his appointments. [AR at 289-91.] When asked whether plaintiff appeared

5  to have any limitations, Ewell testified that plaintiff had trouble with just about everything, from

6  taking out the trash, to playing with his son, to helping cook dinner and completing other daily

7  chores. [AR at 285-86.] Ewell cited plaintiff's fatigue and his back condition as the sources of his

8  limitations, stating that while she did not know what all of the side effects were from plaintiff's

9  medication, she knew what she saw, which was that most things seemed to be a chore for

10  plaintiff. [AR at 285-86.]

11    Prior to testifying, Ewell had filled out a third-party questionnaire on May 9, 2001, where

12  she asserted that plaintiff dressed himself, could cook fast meals, and sometimes did laundry and

13  washed dishes. [AR at 125-26.] Ewell indicated that she did all of the shopping for plaintiff and that

14  plaintiff left the house about two times a month for doctor's appointments, relying on others for

15  transportation. [AR at 125-26.] According to Ewell, plaintiff spends the majority of his day watching

16  television, is withdrawn, and does not like to socialize. [AR at 127.]  Ewell noted that since the

17  onset of his conditions, plaintiff's social life has changed drastically. [AR at 128.] Although plaintiff

18  used to enjoy visiting, going to the movies, and getting outside, Ewell noted that now he is too

19  tired to complete these tasks. [Id.] Plaintiff does not belong to any community, church, sports, or

20  social groups and Ewell noted that he never goes out with others. [AR at 127-28.] Ewell wrote that

21  sometimes plaintiff does not concentrate or remember conversations, and that as a result of

22  fatigue and back pain, he also has trouble following instructions.  [AR at 128.] Ewell also believes

23  plaintiff has become depressed, as he is not able to work or do the things he used to do and has

24  trouble making decisions, often requiring help in solving his problems. [AR at 129.]

25    Dr. Arvin Klein, the medical expert, addressed plaintiff's physical impairments at the

26  hearing. [AR at 293.] Having reviewed the record, Dr. Klein concluded that although plaintiff has

27  a severe medically determinable impairment, plaintiff has a moderate residual functional capacity

28  and has no restrictions on his activities of daily living. [AR at 293.] Dr. Klein rejected plaintiff's

6

1   excess complaints, stating that plaintiff has suffered no apparent secondary effects from HIV and

2   that his musculoskeletal complaints are unsupported by the abundant clinic notes. [AR at 293-94.]

3   Dr. Klein also commented that plaintiff's alcohol abuse could be a contributing factor to plaintiff's

4   mood disorder. [AR at 294-95.] A vocational expert also testified at the hearing. [AR at 296-302.]

5   Based on the hypothetical posed by the ALJ,[4] the expert stated that while plaintiff would not be

6   able to perform any of his past relevant work, he could still perform a significant number of jobs

7   in the national or regional economy. [AR at 298, 300.]

8        From April 17, 1998, until July 27, 2000, plaintiff received treatment at Long Beach Health.

9   [AR at 155-75.] The treatment notes from that period focused primarily on plaintiff's physical

10  ailments and lifestyle. [Id.] On September 22, 1998, plaintiff's physician noted that plaintiff

11  appeared to suffer from a schizo-affective depression and encouraged plaintiff to decrease his

12  alcohol abuse. [AR at 169.] Plaintiff's alcohol abuse was documented throughout his treatment

13  at Long Beach Health. [AR at 167, 168, 169, 172, 174.]

14       Plaintiff also received treatment at the Riverside Neighborhood Health Clinic from March

15  16, 2001, until August 13, 2001. [AR at 226-40.] On April 26, 2001, plaintiff was examined by Dr.

16  Gupta who wrote that plaintiff showed minor signs or symptoms of HIV and did not appear to be

17  visibly fatigued. [AR at 232.] Dr. Gupta also noted indications of a "diagnosed mental impairment,"

18  but did not elaborate further.  [Id.] Ultimately, Dr. Gupta concluded that plaintiff would be able to

19  carry on normal activity and sustain at least a sedentary level of activity for an 8 hour day. [Id.]

20  Plaintiff's treatment records from the Riverside Neighborhood Health Clinic also documented

21  plaintiff's alcohol abuse. [AR at 226-27.]

22       On May 4, 2001, Dr. Salvatore Stella, a medical consultant, completed a Physical Residual

23  Functional Capacity Assessment of plaintiff [AR at 178-85], finding that plaintiff had established

24  various occasional postural limitations. [AR at 180.] Dr. Stella noted that plaintiff had stated that

25

26  _____

     [4]   The ALJ posed the following hypothetical at the hearing: "the claimant would be limited to
27  a full-range of light work with additional nonextertional limitations limiting him to occasional
     climbing, balancing, stooping, kneeling, crouching, or crawling, and a mental limitation limiting him
28  to nonpublic simple repetitive tasks." [AR at 298.]

he could do household chores and laundry without assistance and estimated that he could walk or stand for less than 2 hours and sit for 3 hours prior to resting. [AR at 185.] In addition to noting some inconsistencies between the severity of plaintiff's physical allegations and the objective observations, Dr. Stella also found plaintiff to be partially credible. He concluded that plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, and could stand and/or walk for 6 hours, and sit for 6 hours, in an 8 hour day. [AR at 179.]

On April 29, 2002, Dr. Kamran Matin, an internist, performed a consultative examination on plaintiff. [AR at 243-46.] In addition to diagnosing plaintiff with lower back pain, HIV, and a history of a car accident causing whiplash injury to the cervical region, Dr. Matin described plaintiff as a well-developed and well-nourished individual who ambulates with a mild limp. [AR at 244-45.] Although plaintiff walked with a cane, Dr. Matin stated that plaintiff did not need to do so. [AR at 245.] While plaintiff's x-ray revealed a splinting of the spine to the right, thereby suggesting muscle spasm, and a bullet lodged in the right flank area, Dr. Matin found plaintiff's range of motion in all extremities to be normal. [AR at 244-45.] Dr. Matin also found plaintiff's memory to be intact. [Id.] He concluded that plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, could walk and stand for 4 hours in an 8 hour work day, and could sit with no restrictions. [AR at 245.]

On May 29, 2001, Dr. Andrew Rooks, a board certified psychiatrist, performed a psychiatric evaluation of plaintiff. [AR at 186-92.] During the evaluation, plaintiff had no unusual mannerisms, tics, or tremors. [AR at 189.] Although Dr. Rooks found plaintiff to be somewhat irritable, he also stated that plaintiff was basically cooperative and appeared to be of average intelligence, as plaintiff's thought processes flowed well, were coherent, and were goal-directed. [AR at 186, 189.] Plaintiff was able to give a valid history, was oriented, and had adequate concentration. [AR at 189.] Dr. Rooks concluded that plaintiff is able to understand, carry out, and remember simple instructions, and is able to perform detailed and complex tasks. [AR at 191.]

Dr. Rooks diagnosed plaintiff as having an apparent major depression, with past and possibly recent psychotic symptoms. [AR at 190.] Although plaintiff stated that he suffered from hallucinations and delusions, Dr. Rooks questioned how honest plaintiff was being about his

1    psychiatric symptoms. [AR at 186.] For instance, when asked to elaborate on the hallucinations

2    and delusions he was experiencing, plaintiff did not provide concrete examples, but gave vague

3    answers. [Id.] Although Dr. Rooks found plaintiff to be possibly narcissistic and possess antisocial

4    personality traits, he concluded that plaintiff did not have an antisocial personality disorder. [AR

5    at 190.] While plaintiff's interrelationships with co-workers and the public would be tense and

6    difficult, Dr. Rooks found that plaintiff would still be able to interact with them and deal with

7    reasonable changes in work situations. [AR at 191.] Dr. Rooks stated that if plaintiff "actually had

8    hallucinations," then plaintiff's Global Assessment of Functioning ("GAF") score would be from 45-

9    50.[5] [AR at 190.] If, however, "he doesn't really have hallucinations, then probably around 60."[6]

10    [Id.]

11       On June 5, 2001, plaintiff admitted himself to the Riverside County Regional Medical

12    Center as a "danger to self." [AR at 194-214.]  Plaintiff was discharged on June 7, 2001. [AR at

13    194.] Dr. Alb, an internist, examined plaintiff on June 6 and completed plaintiff's discharge

14    summary. [Id.] In the discharge summary, Dr. Alb noted that plaintiff was irritable, guarded, and

15    depressed, but denied having any auditory or visual hallucinations. [AR at 195-96.] No paranoia

16    or delusions were elicited during the examination. [AR at 196.] Plaintiff's thought process was tight

17    and goal-directed. [AR at 195.] Alert and oriented, plaintiff exhibited good eye contact and was

18    pleasant and cooperative. [AR at 196.] Plaintiff had good hygiene and did not have any abnormal

19    moves or tics. [Id.] Dr. Alb found that plaintiff's memory and cognition were grossly intact and that

20    his insight and judgment were good. [Id.] Dr. Alb diagnosed plaintiff with a mood disorder, not

21

22

23     [5]   A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational  functioning, without regard to impairments in functioning due to physical or

24   environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. 1996) (hereinafter, "DSM IV"). A rating of 41-50 on the

25   GAF scale indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning

26   (e.g., no friends, unable to keep a job)." See id. at 34.

27

28     [6]   A GAF score from 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. See DSM IV, p. 34.

1    otherwise specified, and "rule out alcohol abuse" and an alcohol induced mood disorder. [AR at

2    194.]

3         On June 11, 2001, Dr. Ed O'Malley, a state agency psychiatrist, completed a Psychiatric

4    Review Technique form for plaintiff. [AR at 215-24.] Dr. O'Malley opined that plaintiff suffered from

5    an affective disorder, defined as a disturbance of mood, accompanied by a full or partial manic

6    or depressive syndrome. [AR at 218.]  Dr. O'Malley also diagnosed plaintiff with a personality

7    disorder, such that plaintiff possessed inflexible and maladaptive personality traits which cause

8    either significant impairment in social or occupational functioning or subjective distress, as

9    evidenced by plaintiff's narcissistic and anti-social traits. [AR at 220.] Dr. O'Malley concluded that

10   plaintiff was only slightly limited in his activities of daily living and in maintaining social functioning,

11   and that plaintiff seldom experienced deficiencies in concentration, persistence, or pace that

12   would result in him failing to complete tasks in a timely manner. [AR at 222.] Lastly, Dr. O'Malley

13   concluded that plaintiff would not suffer from episodes of deterioration or decompensation, in work

14   or work-like settings, that would cause him to withdraw from that situation or would exacerbate

15   his signs or symptoms.  [Id.] The above symptoms led Dr. O'Malley to conclude that plaintiff's

16   impairments were non-severe. [AR at 224.]

17        Plaintiff's treatment records from the County of Riverside Mental Health Detention Services,

18   dated May 19, 2003, indicate diagnoses of a mood disorder, not otherwise specified, alcohol

19   abuse, and assign plaintiff a GAF score of 50. [AR at 264.] Plaintiff stated that he was depressed,

20   experienced occasional auditory hallucinations, but denied paranoia or delusions.  [Id.] Plaintiff's

21   speech was within normal limits and he exhibited direct eye contact. [Id.]

22        Plaintiff's treating physician is Dr. Peng.  Dr. Peng has treated plaintiff since August 13,

23   2002, and, as of July 15, 2003, was treating him for depression, impulsivity and psychosis. [AR

24   at 265.]  According to Dr. Peng, plaintiff's psychiatric condition is chronic, significantly impairs his

25   ability to make a decision about his basic needs and medical care, and affects his ability to work.

26   [Id.]  Dr. Peng also indicated that plaintiff has shown only minimal improvement with the usage

27   of antidepressants, antipsychotics, and mood stabilizers. [Id.]

28   /

1 **B.    FAILURE TO CONSIDER LAY TESTIMONY**

2        Plaintiff first contends that the ALJ did not appropriately consider the testimony of plaintiff's

3  ex-girlfriend, Candy Ewell. Specifically, plaintiff asserts that the ALJ erred by not considering

4  Ewell's testimony that plaintiff suffers from fatigue as a result of the medication he is taking, is

5  depressed and irritable, and has problems with concentration and memory. See Joint Stipulation

6  at 3-4.

7        As stated in 20 C.F.R. § 416.913(d), judges may, "in addition to evidence from the

8  acceptable medical sources . . . also use evidence from other sources to show the severity of

9  [plaintiff's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 416.913(d) (2005).

10  Such other sources include spouses, parents and other care givers, siblings, other relatives,

11  friends, neighbors, and clergy. 20 C.F.R. § 416.913(d)(4). Thus, lay witness testimony by friends

12  and family members who have the opportunity to observe a claimant on a daily basis "constitutes

13  qualified evidence" that the ALJ must consider. Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th

14  Cir. 1987); see Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) ("[a]n eyewitness can often tell

15  whether someone is suffering or merely malingering.... [T]his is particularly true of witnesses who

16  view the claimant on a daily basis..."). An ALJ's consideration of lay testimony becomes

17  especially important when a plaintiff alleges "that pain is a significant factor of his alleged inability

18  to work and the allegation is not supported by objective medical evidence in the file." SSR[7] 88-13;

19  see Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996). To reject lay testimony, an ALJ must

20  give reasons "germane to each witness" for doing so. Dodrill, 12 F.3d at 919.

21        The ALJ, however, "does not need to meet the impossible burden of mentioning every

22  piece of evidence" presented to him. Parks v. Sullivan, 766 F.Supp. 627, 635 (N.D. Ill. 1991). As

23  long as substantial evidence supports the ALJ's conclusion and the ALJ explains why "significant

24  probative evidence has been rejected," an ALJ's failure to discuss lay witness testimony

25

26  _____

27  [7]   Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

28

1  constitutes harmless error. Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984). In Vincent,

2  although the ALJ did not discuss plaintiff's son's testimony in his hearing decision, the court held

3  that such an omission did not require reversal because the medical evidence supported the ALJ's

4  decision that the plaintiff was not disabled. Id.

5      The view that an ALJ need not discuss every piece of evidence, even when that evidence

6  is from a lay witness, has found support in the Seventh and Eighth Circuits, especially when lay

7  witness testimony does little more than corroborate a plaintiff's own testimony. In Books v. Chater,

8  a Seventh Circuit decision, the court held that "[a]ll we require is that the ALJ sufficiently articulate

9  his assessment of the evidence to 'assure us that [he] considered the important evidence...[and

10  to enable] us to trace the path of the ALJ's reasoning.'" Books v. Chater, 91 F.3d 972, 980 (7th

11  Cir. 1996) (quoting Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (quoting Stephens v.

12  Heckler, 766 F.2d 284, 287 (7th Cir. 1985)). Since plaintiff's brother's testimony in Books "did not

13  constitute a separate 'line of evidence,'" but "served strictly to reiterate, and thereby corroborate,

14  [plaintiff's] own testimony concerning his activities and limitations" -- and the plaintiff's testimony

15  was found by the ALJ to be "untenable" when contrasted with his daily activities and the medical

16  evidence -- the court held that the ALJ's failure to specifically discuss the plaintiff's brother's

17  testimony was not error. Books, 91 F.3d at 980. Similarly, in Young v. Apfel, the Eighth Circuit

18  held that "[a]lthough specific articulation of credibility findings is preferable, we consider the lack

19  thereof to constitute a deficiency in opinion-writing that does not require reversal" as long as the

20  ALJ's "ultimate finding is supported by substantial evidence in the record." Young v. Apfel, 221

21  F.3d 1065, 1068 (8th Cir. 2000). In Young, since the same evidence the ALJ used to discount the

22  plaintiff's testimony "also support[ed] discounting the testimony of [the plaintiff's] husband," the

23  court held that "the ALJ's failure to give specific reasons for disregarding [the husband's]

24  testimony [was] inconsequential." Id.

25      Any error by the ALJ in this case by not discussing Ewell's testimony was harmless

26  because substantial evidence supports the ALJ's conclusion that plaintiff was not disabled. The

27  ALJ first considered plaintiff's physical limitations. [AR at 12.] Although x-rays taken in April 2002

28  revealed evidence of muscle spasms as well as a bullet lodged in plaintiff's right flank, plaintiff,

1  upon examination by Dr. Matin, exhibited a normal range of motion of his extremities and

2  ambulated with only a mild limp. [AR at 244-45.] Although plaintiff walked with a cane, Dr. Matin

3  stated that plaintiff did not need to do so. [AR at 245.]  In fact, the only work-related limitations

4  identified by Dr. Matin included that plaintiff could lift and carry 25 pounds frequently and 50

5  pounds occasionally and stand and/or walk for 4 hours in an 8 hour day with normal breaks. [Id.]

6  With respect to plaintiff's HIV status, plaintiff's treatment records from the Riverside Neighborhood

7  Health Clinic, to which the ALJ referred, revealed that when plaintiff was examined by Dr. Gupta,

8  plaintiff did not appear to be visibly fatigued and exhibited only minor signs or symptoms of the

9  disease. [AR at 12, 232.] Similar to Dr. Matin, Dr. Gupta concluded that plaintiff could sustain at

10  least a sedentary level of activity for an 8 hour day. [AR at 232.] Dr. Klein, the medical expert who

11  testified at the hearing, also concluded that plaintiff did not appear to be suffering from any

12  secondary effects as a result of his HIV status. [AR at 293.]

13      After reviewing plaintiff's physical limitations, the ALJ considered plaintiff's mental

14  impairments. [AR at 13.] In reaching his decision, the ALJ relied considerably on the report of the

15  examining psychiatrist, Dr. Rooks. [Id.] Although Dr. Rooks diagnosed plaintiff with an apparent

16  major depression and possibly narcissistic and anti-social personality traits, he concluded that

17  plaintiff would still be able to interact with his co-workers and deal with reasonable changes in the

18  work place. [AR at 190-91.] Dr. O'Malley, a state agency psychiatrist, reached a similar

19  conclusion, finding that despite plaintiff's affective disorder and depressive syndrome, his

20  restrictions of activities of daily living and difficulties in maintaining social functioning were slight.

21  [AR at 222.] Neither psychiatrist noted that plaintiff suffered from poor concentration.[8] On the

22  contrary, Dr. Rooks found plaintiff to have adequate concentration and to be able to understand,

23  carry out, and remember simple instructions, thereby enabling him to perform detailed and

24  complex tasks. [AR at 189, 191.]

25

26  _____

27      [8]   In his evaluation of plaintiff, Dr. O'Malley noted that plaintiff seldom experienced deficiencies
    in concentration, persistence or pace that would result in plaintiff's failure to complete a task in
28  a timely manner, in work settings or elsewhere. [AR at 222.]

1   Merely reiterating what plaintiff had testified to previously, Ewell's testimony was neither

2   significant nor probative, and added little, if anything, to the record. At the hearing, plaintiff testified

3   that he experienced problems with depression, suffered from mood swings, had trouble

4   concentrating and remembering his appointments, and slept most of the day as a result of the

5   medication he was taking. [AR at 281-82.] Similarly, Ewell testified that plaintiff was depressed

6   and irritable, and had trouble concentrating and focusing, stating that he had difficulty

7   remembering to go to his appointments. [AR at 289-91.] Also, Ewell testified that plaintiff appeared

8   fatigued, which she thought resulted in part from the medication he was taking. [AR at 285.] While

9   lay witness testimony should generally not be ignored without comment, especially when, as here,

10  the witness observes plaintiff on a daily basis and the objective medical evidence does not

11  support plaintiff's excess complaints of pain, an ALJ's failure to explain his rejection of such

12  testimony constitutes harmless error when that testimony does little more than corroborate

13  plaintiff's testimony and adds nothing of substance to the record, as is the case with Ewell's

14  testimony. See 20 C.F.R. § 416.913(d); SSR 88-13; Books, 91 F.3d at 980; Vincent, 739 F.2d at

15  1395. Furthermore, even if Ewell's testimony had added significant information to the record, the

16  ALJ did not completely ignore it, but considered implicitly.  Since the ALJ based his decision in

17  part on the testimony of the medical and vocational experts, and that testimony was elicited

18  immediately after and with reference to Ewell's testimony,[9] the ALJ therefore implicitly and

19  appropriately considered and rejected Ewell's testimony. [AR at 12, 15, 292, 296.]

20  Since Ewell's testimony essentially mirrored plaintiff's own testimony, the same evidence

21  used to discount plaintiff's testimony could also be used to discount the testimony of Ewell.

22  Young, 221 F.3d at 1068. To discount plaintiff's testimony and excess complaints, the ALJ, after

23  careful consideration of the record, pointed to the fact that "no treating or examining physician has

24  ever opined that the claimant is totally or permanently disabled, whether due to a physical or

25

26  _____

27  [9]   Before each expert testified, the ALJ asked the expert whether he had been present for
    and heard the preceding witnesses' testimony. Both responded in the affirmative. [AR at 292, 296-
28  97.]

mental impairment,"[10] that plaintiff was only partially credible,[11] and that plaintiff had a history of alcohol abuse, which could possibly serve to exacerbate his depressive symptoms.[12] [AR at 14.] Given the previously described similarities between the testimony of plaintiff and Ewell, the above evidence used to discount plaintiff's testimony also supports discounting Ewell's testimony. The validity of the ALJ's decision to reject plaintiff's testimony is strengthened by the fact that plaintiff has not contested any of the ALJ's reasons for rejecting his excess complaints. See Joint Stipulation at 3.

Thus, not only was the ALJ's decision to not find plaintiff disabled supported by substantial evidence in the record, but Ewell's testimony was neither significant nor probative, as it merely reiterated plaintiff's own testimony and therefore added little, if anything, to the record. Remand is not required on this issue.

/

/

/

---

[10]   Although claimant's current treating physician, Dr. Peng, cited plaintiff's history of depression, impulsivity, and psychosis and opined that plaintiff's mental condition was chronic and affected his ability to work, Dr. Peng did not express an opinion of total, permanent disability, or impose any specific work-related limitations. [AR at 14, 265.] Further, given the brevity and cursory nature of Dr. Peng's statements, the ALJ need not assign them much weight. See Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) ("the ALJ need not accept a treating physician's opinion which is 'brief and conclusory in form with little in the way of clinical findings to supports [its] conclusion'").

[11]   During his examination of plaintiff, Dr. Rooks questioned the validity of plaintiff's allegations of auditory hallucinations, stating, "there is a question in my mind about how honest he was about his psychiatric symptoms. He tended to be vague at times, especially when I asked him about the hallucinations and delusions." [AR at 186.] Dr. Rooks also noted a discrepancy between plaintiff's ability to engage in sexual conduct on multiple occasions and plaintiff's complaints of severe lower back pain. [AR at 189.] Dr. Stella also found plaintiff to be only partially credible. [AR at 185.]

[12]   Plaintiff admitted to alcohol abuse on June 5, 2001, during his initial examination at Riverside County Regional Medical Center, stating that he had regularly drank about 64 ounces of beer every other day for the past 17 years. [AR at 210.] Plaintiff's alcohol abuse was also documented on numerous occasions by his examining physicians at Long Beach Health. [AR at 167, 168, 169, 172.] Dr. Gupta, an internist, also documented plaintiff's alcohol abuse. [AR at 226-27.]

1  C.    INCOMPLETE HYPOTHETICAL

2        Plaintiff next asserts that the ALJ posed an incomplete hypothetical to the vocational

3  expert. Specifically, plaintiff contends that the ALJ did not include in his hypothetical the side

4  effects of plaintiff's medication, plaintiff's poor concentration, and plaintiff's irritability, as set forth

5  by Ewell's testimony, discussed supra.  Joint Stipulation at 7.

6        While hypothetical questions posed to a vocational expert must set forth all of the

7  limitations and restrictions of a particular claimant (Andrews, 53 F.3d at 1043; Embrey v. Bowen,

8  849 F.2d 418, 422 (9th Cir. 1988)), the ALJ is not required to include limitations for which there

9  was no substantial evidence.  See Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2001) ("It

10  is . . . proper for an ALJ to limit a hypothetical to those impairments that are supported by

11  substantial evidence in the record."); Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989)

12  ("The vocational expert's opinion about a claimant's residual functional capacity has no evidentiary

13  value if the assumptions in the hypothetical are not supported by the record."); Sample v.

14  Schweiker, 694 F.2d 639, 644 (9th Cir. 1982) ("An expert's testimony is valuable only to the extent

15  it is supported by medical evidence.").

16        Plaintiff's assertion that the hypothetical posed to the vocational expert should have

17  included both the side effects of his medication and his poor concentration is without merit, as

18  neither condition is supported by substantial evidence in the record. While both plaintiff and Ewell

19  testified that plaintiff suffered from fatigue as a result of his medication, the medical record lends

20  little, if any, support for this assertion. As indicated by plaintiff's treatment notes from the Riverside

21  Neighborhood Health Center, none of the examining physicians noted that plaintiff was suffering

22  from any side effects from his medication. [AR at 225-40.] Instead, the treatment notes

23  /

24  /

25  /

26  /

27  /

28  /

1   indicate that plaintiff appeared to be relatively healthy during that period.[13] Also, as noted by Dr.

2   Klein, the records indicate that plaintiff does not appear to be wasting away, but has maintained

3   a relatively stable weight since being diagnosed with HIV.[14] [AR at 293.] In fact, plaintiff does not

4   point to a single doctor's report that supports his assertion that he suffers from fatigue or any other

5   side effects as a result of the medication he is taking. See Joint Stipulation at 3, 7.  Similarly,

6   plaintiff fails to support his contention that he suffers from poor concentration. [Id.] On the

7   contrary, several physicians found him to possess an adequate level of concentration.[15]  Thus,

8   the ALJ also correctly excluded plaintiff's poor concentration from the hypothetical.

9        Plaintiff also contends that the ALJ should have included the limitation of his irritability in

10   the hypothetical posed to the vocational expert. Although plaintiff's irritability is documented in the

11   medical record on several occasions,[16] the ALJ's failure to include it in the hypothetical constitutes

12   harmless error.  The court in Booz v. Secretary of Health and Human Services, 734 F.2d 1378,

13   1381 (9th Cir. 1984), asserted that the test for determining whether an error is harmless is

14   "whether there is a reasonable possibility that [the new evidence] would have changed the

15   outcome of the present case." As stated supra, the ALJ's decision to deny plaintiff benefits in this

16   case is supported by substantial evidence. Also, while the ALJ's hypothetical may not have

17   _____

18   [13]   On March 16, 2001, plaintiff stated that his health was good. [AR at 240.] When Dr. Gupta
     examined plaintiff of April 26, 2001, he noted that plaintiff showed only minor signs or symptoms
19   of HIV and did not appear to be visibly fatigued. [AR at 232.] Again, on August 30, 2001, the
     examining physician noted that plaintiff's HIV status was stable. [AR at 226.]
20

21   [14]   In September 1998, plaintiff weighed 161 pounds. [AR at 168.] When plaintiff was
     examined by Dr. Gupta in April 2001, he weighed 168 pounds. [AR at 232.] On April 29, 2002,
22   plaintiff weighed 166 pounds. [AR at 243.]

23   [15]   Dr. Rooks noted on May 29, 2001, that plaintiff's thought processes flowed well, were
     coherent and goal-directed, and that plaintiff had adequate concentration. [AR at 189.] On June
24   6, 2001, Dr. Alb noted that plaintiff's memory and cognition were grossly intact and that his
     thought process was tight and goal-directed. [AR at 196.] On June 11, 2001, Dr. O'Malley noted
25   that plaintiff seldom experienced deficiencies of concentration, persistence or pace. [AR at 222.]
     On April 29, 2002, Dr. Matin noted that plaintiff's memory appeared to be intact. [AR at 245.]
26

27   [16]   In his discharge summary of plaintiff dated June 11, 2001, Dr. Alb described plaintiff's
     mood as irritable, guarded, and suspicious. [AR at 195.] During his evaluation of plaintiff, Dr.
28   Rooks noted that plaintiff was slightly restless and irritable. [AR at 189.]

1  included the word "irritability" specifically, it did include the limitation that plaintiff's work

2  environment be "nonpublic," a description that could be construed as an adequate incorporation

3  of plaintiff's irritability. [AR at 298.] Further, the vocational expert was present during the hearing,

4  testified that he had heard Ewell's testimony, and had reviewed the documents in the file prior to

5  concluding that plaintiff could perform a significant number of jobs in the regional or national

6  economy. Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002) (holding that a vocational

7  expert's presence during a witness' testimony and possession of a copy of the exhibits presented

8  at the hearing may serve to adequately incorporate the plaintiff's functional limitations, as

9  described by that witness, into the hypothetical, even though the ALJ did not specifically include

10  them in that hypothetical). In light of the above factors, it is apparent that there is no reasonable

11  possibility that adding plaintiff's irritability to the hypothetical would have changed the outcome of

12  the case. Remand is not warranted.

13

14                                                    VI.

15                                              CONCLUSION

16          Accordingly, **IT IS HEREBY ORDERED** that: 1. plaintiff's request for remand is **denied**; and

17  2. the decision of the Commissioner is **affirmed**.

18          **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the

19  Judgment herein on all parties or their counsel.

20

21
      DATED: July 25, 2005
22                                                              PAUL L. ABRAMS
                                                         UNITED STATES MAGISTRATE JUDGE
23

24

25

26

27

28